UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-

LUDWIG CRISS ZELAYA ROMERO,

                Defendant.

S1 15 Cr. 174 (LGS)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

Jacob Gutwillig
Jason A. Richman
Elinor L. Tarlow
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................. 3

   I. The Defendant's Offense Conduct .................................................................... 3

   II. Procedural History ........................................................................................... 9

      A. The Charges ................................................................................................ 9

      B. The Defendant's Guilty Plea ...................................................................... 9

      C. The Presentence Investigation Report ...................................................... 10

      D. Pre-Sentencing Filings .............................................................................. 10

DISCUSSION ............................................................................................................. 11

   I. A Guidelines Sentence Is Appropriate ........................................................... 12

      A. The Nature and Seriousness of the Defendant's Crime ........................... 12

      B. The Defendant's Personal Characteristics ................................................ 16

      C. The Need to Avoid Unwarranted Sentencing Disparities ........................ 17

      D. The Need for Deterrence and Just Punishment ........................................ 19

   II. The Defendant's Sentencing Arguments Are Meritless ................................. 20

      A. The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence ..... 21

      B. The COVID-19 Pandemic Does Not Support A Non-Guidelines Sentence .... 23

   III. The Court Should Impose Forfeiture ............................................................ 28

   IV. The Court Should Order the Defendant to Pay a Fine ................................. 28

CONCLUSION ............................................................................................................ 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | S1 15 Cr. 174 (LGS) |
| LUDWIG CRISS ZELAYA ROMERO, | |
| Defendant. | |

The Government respectfully submits this memorandum in advance of the defendant's sentencing, which is scheduled for May 10, 2021.   The defendant is one of six members of the Honduran National Police convicted in this case of drug-trafficking crimes in connection with their support of a violent Honduran drug-trafficking organization known as the *Cachiros*.[1]   The defendant joined the *Cachiros* in approximately 2004 and was a trusted member of the organization for over a decade.  During that time, while nominally also employed as a police officer in Honduras, he committed murders, recruited teams of hitmen, and protected massive cocaine loads as they transited Honduras en route to the United States.  The defendant played a leadership role in the organization—reflected in the 3-level Guidelines enhancement he stipulated to in connection with his plea—and even recruited another member of the Honduran National Police to join the *Cachiros*. Accordingly, and for the reasons set forth below, the Government respectfully submits that the Court should impose a term of imprisonment within the stipulated Guidelines range of 235 to 293 months' imprisonment, impose forfeiture in the amount of $120,000, and order the defendant to pay a fine within the Guidelines range of $25,000 to $5,000,000.

---

[1] A seventh member of the Honduran National Police, Carlos Jose Zavala Velasquez, was convicted of a drug-trafficking crime in this case related to his support of a Honduran criminal organization operated by Hector Emilio Fernandez Rosa.

## BACKGROUND

### I.    The Defendant's Offense Conduct

Since at least 2013, the Drug Enforcement Administration ("DEA") has been investigating individuals in Honduras and elsewhere who have participated in large-scale drug trafficking and money laundering activities relating to the importation of tons of cocaine into the United States. (June 25, 2019 Presentence Investigation Report ("PSR") ¶ 11).  The investigation revealed that, between at least approximately 2004 and approximately 2020, multiple drug-trafficking organizations worked in concert with politicians, law enforcement officials, and military personnel to (i) receive multi-hundred-kilogram loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime routes; and (ii) transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.  (*See id.* ¶ 12).  Often, these drug traffickers paid bribes—styled as "campaign contributions"—to Honduran politicians holding and/or running for office, on the understanding that the politicians would support trafficker-friendly policies regarding matters such as investigative priorities and extradition policy.  (*Id.*).  In addition, in order to facilitate the safe passage through Honduras of these huge loads of cocaine, traffickers paid bribes to public officials for access to information about ongoing investigations, checkpoints, and planned interdictions.  (*Id.*).

One of the largest and most violent drug-trafficking organizations in Honduras was the *Cachiros*.  (PSR ¶ 14).  In approximately 2013, the leaders of the *Cachiros*—Javier Rivera Maradiaga ("Javier") and Devis Leonel Rivera Maradiaga ("Leonel")—began to cooperate with the DEA's investigation in Honduras to target, among others, the defendant and high-ranking corrupt Honduran officials.  (*See id.*).  The defendant's involvement with the *Cachiros*, however, significantly predates the cooperation of Javier and Leonel.  In 2004, another member of the

Honduran National Police (the "HNP") introduced Javier and Leonel to the defendant who then, in turn, introduced them to other members of the HNP.  (*Id.* ¶ 15).  The defendant became a valued member of the organization, with access to information about police interdiction efforts and highway checkpoints, and the ability to help protect cocaine loads as they moved through Honduras.  From approximately 2005 through 2011, Leonel or Javier would contact the defendant when the *Cachiros* were expecting a load of cocaine in the Colon Department of Honduras, which typically occurred on at least a monthly basis.  (*Id.*).  The Colon Department was a key location for the drug trade on Honduras's Atlantic coast, where many maritime drug shipments arrive from South America on their way to the United States:



Once the cocaine arrived in the Colon Department, it was transported by land through Honduras on its way to Guatemala, Mexico, and, eventually, the United States.  (PSR ¶ 16).  Here, too, the defendant played a key role.  Leonel and Javier informed him whenever a cocaine load was being moved, and the defendant and other HNP members would then coordinate with other police officials to bypass or remove police checkpoints along the route.  (*Id.*).  In so doing, the defendant

helped ensure safe passage for tons and tons of cocaine—enough for millions of individual doses on the streets of New York.   Indeed, Leonel estimated at a recent trial that the *Cachiros* distributed over 130 tons of cocaine for eventual distribution in the United States.   (*See United States v. Juan Antonio Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 109, at 764-65).

Beyond that, the defendant also played a key role in the violence the *Cachiros* employed to maintain and grow their drug distribution organization.   In approximately 2012, Leonel directed the defendant to assemble a team of assassins to conduct a maritime siege on a hotel in Puerto Lempira, La Mosquitia, Honduras, where Leonel believed a rival drug trafficker was staying. (PSR ¶ 17(a)).   The murder was never carried out, despite the defendant's efforts to locate a team of assassins.   Next, in 2013, other Honduran traffickers contacted Leonel and told him that they wanted a local attorney murdered for failing to return fees they had paid the attorney.   (*Id.* ¶ 17(b)). Leonel put these traffickers in contact with the defendant, who was again tasked with recruiting a team of assassins to murder the attorney.   (*Id.*).   The defendant later told Leonel that the gang members he had recruited had tried but failed to assassinate the attorney.   (*Id.*).   Then, in July 2013, Leonel tasked the defendant with murdering a journalist who had been critical of Leonel.   (*Id.* ¶ 17(c)).   As a result, a journalist named Anibal Barrow—though not the intended target—was murdered.   (*Id.*).   In an interview with the DEA conducted in connection with his surrender, the defendant admitted that he provided the name of an assassin to another reporter who was working with Leonel to murder the reporter that Leonel wanted dead.   (Ex. A, July 13, 2016 DEA Inxterview of the Defendant, ¶ 20).   The defendant told the DEA that he obtained the name of this assassin from a *list of a number of assassins* that he had access to.   (*Id.*).   Ultimately, when the defendant heard that Barrow was murdered, he told the DEA that he was surprised, because he knew the intended target was someone else.   (*Id.*).

In this interview with the DEA, the defendant also admitted to his role in a 2011 massacre at the airport in San Pedro Sula, Honduras.  In particular, the defendant admitted that members of a Honduran gang named *Los Grillos* had robbed an individual who wanted to purchase 100 kilograms of cocaine from them.  (Ex. A ¶ 16).  After the robbery, Leonel and the leaders of the Honduras-based *Los Valles* cartel decided that they needed to send a message to *Los Grillos* that this conduct would not be tolerated.  (*Id.*).  In retaliation, after Leonel learned that the leader of *Los Grillos*, known as "El Sapo," was scheduled to fly into the airport in San Pedro Sula, Honduras, he told the defendant to go to the airport and call Leonel's assassins once he saw "El Sapo" come outside the airport.  (*Id.*).  The defendant claimed that he never saw "El Sapo" leave the airport, but that when he was walking around the parking lot, he saw the team of assassins executing their victims.  (*Id.*).  More specifically, the defendant saw the assassins order their victims out of their cars; force them to lay face down on the pavement; and then execute them by shooting them multiple times in the back of the head and the back.  (*Id.*).  Media reporting from this incident indicates that six people were killed.  (*See* Ex. B, CNN, *Gunmen Kill Six in Honduras Airport Shooting*, Oct. 15, 2011; Ex. C, The World, *Gunmen Kill Six Outside Honduras Airport¸* Oct. 15, 2011).  Corroborating the defendant's confession, the head of airport security reported to CNN that eight men arrived at a parking lot checkpoint, forced people out of two other vehicles, shot them dead, and then exchanged fire with airport security before fleeing.  (Ex. C at 1).

The defendant also told the DEA about a murder that he carried out himself on behalf of the *Cachiros*.  (Ex. A ¶ 17).  The defendant admitted to the DEA that, a few years prior, the eventual victim of his murder instructed two of his employees to rob a truck that was carrying a large quantity of concealed money.  (*Id.*).  After the employees robbed the money, they also killed the driver and passenger of this truck.  (*Id.*).  Another trafficker then asked Leonel if he could avenge

6

these murders, and Leonel promised to do so.  (*Id.*).  The defendant and a co-conspirator recruited a local "kid" to carry out the assassination, but when they arrived at the target's business, the recruit got scared and refused to carry out the plan.  (*Id.*).  When the defendant told Leonel about this refusal, the defendant claims that Leonel threatened to kill the defendant if the defendant did not carry out the hit himself.  (*Id.*).  The defendant then shot the victim several times with a semi-automatic 9 mm pistol, killing him.  (*Id.*).

Finally, as the defendant admitted to the DEA, his co-conspirator and co-defendant, Juan Manuel Avila Meza, contacted him in May 2014 and told him that "the man," a reference to Leonel, wanted to speak with him.  (*Id.* ¶ 4).  The defendant then went with Avila Meza to a mechanic shop in San Pedro Sula to meet with Leonel.  (*Id.* ¶ 5).  When they arrived at the meeting, Leonel stayed inside the car, and a purported Mexican national, who was, in fact, working at the direction of the DEA ("CS-1") met with the defendant and Avila Meza.  (*Id.*).  During the meeting, CS-1 told the defendant and Avila Meza that he needed a team of 10 HNP officers to help him transport cocaine through Honduras.  (*See id.* ¶ 6).  After the meeting, Avila Meza instructed the defendant to take Avila Meza to Colon to help him get familiar with the area for their planned operation with CS-1, which the defendant did.  (*Id.* ¶ 8).

A few days later, Avila Meza contacted the defendant and told him to come to his office so that they could meet again and discuss their plans with CS-1.  (PSR ¶ 9).  At this meeting, the defendant showed Avila Meza all the police checkpoints in the northern part of Honduras and how many officers were at each post.  (*Id.*).  Avila Meza further suggested that they should bring a map to their next meeting with CS-1 to show him the same.  (*Id.*).  Shortly after, Avila Meza contacted the defendant and told him there would be another meeting with CS-1, Avila Meza, Mario Mejia Vargas, Carlos Zavala Velasquez, and Victor Oswaldo Lopez Flores, all of whom were ultimately

charged as co-defendants in this case.  (*Id.* ¶ 10).  In addition, the defendant then recruited another HNP member and eventual co-defendant, Jorge Cruz Chavez, to join them.  (*Id.*).  The defendant admitted to the DEA that he recruited Cruz Chavez because he was a good friend and someone he trusted.  (*Id.*).

The defendant then met with Avila Meza and other members of the conspiracy.  (*Id.* ¶ 11). During the course of the meeting, another co-conspirator and eventual co-defendant in this case, Carlos Valladares Garcia, joined the group.  (*Id.*).  Before the meeting, Avila Meza placed a map— the same map he had used in meeting with the defendant days prior—on the table and showed his co-conspirators the drug route that CS-1 was interested in using.  (*Id.*).  Shortly after, CS-1 and another confidential source posing as a representative of the Sinaloa Cartel ("CS-2" and, with CS-1, the "CSes") arrived at the meeting along with eventual co-defendant Fabio Lobo, the son of the former President of Honduras.  (*Id.* ¶ 12).  The CSes explained to the HNP officers the details of their planned cocaine distribution; namely, that they wanted to transport 3 tons of cocaine through Honduras, and expected it to arrive by boat at La Mosquitia, Honduras, transit by ground through Honduras, Guatemala, and Mexico, for eventual distribution by the Sinaloa Cartel to the United States.  (*Id.*).  The CSes asked the defendant to be in charge of talking to the Honduran Navy commander who was to assist with the plan, and to provide the naval officials with encrypted phones to use during the operation.  (*Id.*).  Avila Meza showed the CSes the planned drug route on the map he had brought to the meeting.  (*Id.* ¶ 13).  The defendant also admitted that the *Los Valles* drug trafficking organization—another of the largest and most violent in Honduras—was the intended recipient of the cocaine for transport across the Honduras/Guatemala border.  (*Id.*). Finally, the defendant admitted that the *Cachiros* had paid him approximately $120,000 for his involvement with the organization.   (*Id.* ¶ 21).

**II.     Procedural History**

**A.     The Charges**

On June 29, 2016, a grand jury in this District returned Superseding Indictment S1 15 Cr.

174 (the "Indictment"), which charged the defendant in three counts:

- <u>Count One</u>:  participating in a conspiracy to import cocaine into the United States, between 2004 and approximately June 2014, in violation of 21 U.S.C. § 963;

- <u>Count Two</u>: using and carrying machineguns and destructive devices in furtherance of Count One, between approximately 2004 and approximately June 2014, in violation of 18 U.S.C. § 924(c); and

- <u>Count Three</u>: participating in a conspiracy to use and carry machineguns and destructive devices in furtherance of Count One, between 2004 and approximately June 2014, in violation of 18 U.S.C. § 924(o).

The Government announced the filing of the Indictment on June 29, 2016, and the charges were

the subject of significant media coverage in Central America.   On or about July 12, 2016, the

defendant's five HNP co-defendants all arrived in the United States after surrendering in

connection with this case.  The defendant surrendered to the DEA in Honduras on July 13, 2016.

(Ex. A ¶ 1).

**B.   The Defendant's Guilty Plea**

On April 16, 2018, the defendant pleaded guilty, pursuant to a plea agreement, to Counts

One and Three of the Indictment.  (PSR ¶ 6).  In connection with his plea, the defendant stipulated

that (a) the offense involved more than 450 kilograms of cocaine, resulting in the highest base

offense level of 38; and (b) the defendant was a manager or supervisor of the conspiracy, and that

the conspiracy involved five or more participants or was otherwise extensive, resulting in a 3-point

enhancement pursuant to Guidelines Section 3B1.1(b).  (*Id.*).  Ultimately, the defendant stipulated

that the applicable Guidelines range is 235 to 293 months' imprisonment.  (*Id.*).

### C.  The Presentence Investigation Report

On September 12, 2018, the Probation Office issued the PSR.  The PSR contains the same Guidelines calculation as is in the Plea Agreement, resulting in an applicable Guidelines range of 235 to 293 months' imprisonment.  (PSR ¶ 71).  The Probation Office recommends a within-Guidelines sentence of 235 months' imprisonment.  (*Id.* at p. 20).  In part, the Probation Office bases this recommendation on the fact that the defendant used his "law enforcement position" and "credentials as an officer with the Honduran National Police" to "participate[ ] in a drug conspiracy that flooded the U.S. with metric tons of cocaine."  (*Id.* at p. 21).  This, the PSR emphasizes, was a violation of the "sworn oath" that the defendant took "to uphold the law and protect the public from those who are involved in criminal activity."  (*Id.*).  The Probation Office found no factors that would warrant a departure from the Guidelines range.  (PSR ¶ 87).

### D.  Pre-Sentencing Filings

The defendant has filed three submissions in advance of sentencing.  On September 3, 2019, the defendant filed a submission arguing for a below-Guidelines sentence of 96 months' imprisonment.  ("Def. Mem.," Dkt. 387 at 2).  In this submission, the defendant contested the acts of violence contained in Paragraph 17 of the PSR.  (Def. Mem. at 2).  ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████On October 17, 2019, the Court ordered a mental health evaluation by a Court-appointed expert.  (Dkt. 390).  On October 18, 2019, the Court scheduled a *Fatico* hearing

---

[2] As the defendant has filed this submission and his April 19, 2021 supplemental submission under seal, the Government has redacted the portions of its submission relating to certain of these materials pending further order from the Court.

concerning the defendant's objections to Pagaraph17.  (Dkt. 391).[3]  On November 1, 2019, the Government identified its anticipated witnesses at the *Fatico* hearing.  (Dkt. 399).  After a December 5 status conference, the Court adjourned the *Fatico* hearing and asked the parties to propose dates for the hearing on or after March 16, 2020.  (Dkt. 409).  The Court then scheduled the hearing for March 24, 2020.  (Dkt. 414).  After the onset of the COVID-19 pandemic froze Court operations, the Court repeatedly adjourned the hearing.  (Dkts. 432, 438, 440, 461).  Finally, on October 30, 2020, the defendant filed a letter informing the Court that he "no longer wishes to proceed with a *Fatico* hearing in this matter."  (Dkt. 472).[4]  On this basis, the court scheduled the defendant's sentencing for January 20, 2021, and then adjourned at it the request of the defendant, twice, first to March 23, 2021, and then to May 10, 2021.  (Dkts. 482, 507).  ███████████

████████████████████████████████████████████

## DISCUSSION

The defendant was a corrupt police officer who abused his position to assist one of the largest and most violent criminal syndicates in Honduras for a decade.  He provided the *Cachiros* with information, protection, and intimidation through violence, and personally assisted in murders that resulted in at least six deaths.  Along the way, the defendant profited handsomely, and he admitted that he was paid at least $120,000 for his work with the *Cachiros*.  The defendant argues

---

[3] Avila Meza was also scheduled to participate in the *Fatico* hearing but he, too, eventually withdrew his objections to his presentence investigation report.

[4] The Court should thus treat the facts in Paragraph 17 as admitted.   *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."); *United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005) ("Since the defendant made no objections to the facts contained in the PSR, the fact [contained therein] may be taken as admitted."); *see also United States v. Rizzo*, 349 F.3d 94, 99 (2d Cir. 2003) (noting that if a defendant does not challenge a fact in a PSR, the defendant waives the right to contest such a fact on appeal).

that a sentence of 84 months' imprisonment—a fraction of even the bottom of the applicable Guidelines range and far below that of some of his co-conspirators who did not participate in multiple murders—is fair and appropriate in this case, in part laying blame for his crimes on the emotional and psychological impact of the corrupted system he helped proliferate. The defendant also seeks the Court's leniency in light of his mental health issues, the COVID-19 pandemic, and his conditions of pre-trial confinement. For the reasons that follow, the defendant's arguments do not merit the leniency he now seeks, and the Court should impose a sentence within the applicable Guidelines range of 235 to 293 months' imprisonment.

## I.      A Guidelines Sentence Is Appropriate

As the Probation Office determined in its pre-sentence report, a Guidelines sentence is appropriate in this case in light of the Section 3553(a) factors, including the nature and seriousness of the defendant's crime, the defendant's personal circumstances, the need to avoid unwarranted sentencing disparities with the defendant's co-conspirators, and the need for general and specific deterrence. (*See* PSR at p. 19.)

### A.      The Nature and Seriousness of the Defendant's Crime

The nature, circumstances, and seriousness of the defendant's crime cannot be overstated. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). He participated in a drug trafficking organization that distributed tons of cocaine through multiple countries for sale in the United States. Along the way, individuals like the defendant, and the poison that he helped to distribute, destroyed families, ravaged communities, and took countless lives. "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and

whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at

*3 (S.D.N.Y. July 6, 2020) (quotations omitted).   When the defendant participated in the

distribution of cocaine at this magnitude, he "participated in an important way in the distribution

of a substance, which creates misery in the lives of the people who use it," and he "was indifferent

to the poison that was being distributed and ruining people's lives." *United States v. Aguirre*

*Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).   And the extensive harm caused by the

defendant was not limited to Honduras and the United States.   This sort of cocaine trafficking

harms every country the drugs transit:

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other
> countries, the safety of people in those countries, in the strength of their institutions,
> including their judicial institutions, including their police and prosecutorial forces.
> This drug activity contributes to all of that.   It is organized crime.   When people
> decide to assist organized crime enterprises, they have to understand the
> consequences that are caused by that in multiple countries.   It is a serious crime.

*United States v. Cabezas Garcia*, No. 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21).   People like the

defendant cause this cocaine trade to proliferate and allow corruption and violence to take root in

their communities and all the countries through which the cocaine transits.   As recently recognized

by Judge Castel in sentencing Juan Antonio Hernandez Alvarado, a/k/a "Tony Hernandez," the

former Colombian congressman and brother of the President of Honduras who was convicted at

trial in 2019, "[e]nding the movement of cocaine from Colombia through Honduras, Guatemala

and Mexico to the United States is the hope of all good people in Honduras, the United States, and

other countries of the Americas." *United States v. Hernandez Alvarado*, No. 15 Cr. 379 (PKC)

(Dkt. 288 at 5).   Sadly, men like the defendant seek to do just the opposite, and they erode the

public's trust in Honduran institutions to line their own pockets with drug money.

Further, the defendant's conduct is aggravated by both the depth of his involvement and

the fact that he participated as a member of the HNP, entrusted to protect the public in his home

country.  The Court has recognized the gravity of this conduct in related sentencings.  At the sentencing of Lopez Flores, the Court explained:

> [T]his is a very serious offense in the context of tons of cocaine that are being shipped into the United States via Honduras.  The offense that you pleaded guilty to was being part of a conspiracy that, between 2006 and 2013, worked to import or export, as it were, drugs from Honduras to the United States, but importantly, with the help of politicians and law enforcement officials, like yourself, and military personnel, and to receive multi-hundred kilogram loads of cocaine to Honduras from Venezuelan and Colombia via air and water, and also to transport the drugs westward in Honduras towards the border with Guatemala and eventually the United States.

(Sentencing Tr. 21, *United States v. Lopez Flores*, No. 15 Cr. 174 (LGS) (Feb. 6, 2018)).  When sentencing Valladares Garcia, the Court aptly summarized the harm to Honduras and the United States arising from this type of drug trafficking:

> It is sometimes difficult in drug cases to realize how serious the crime is and its impact on people, but I am sure just from looking at the society in Honduras and how it has been ravaged by drug dealers, that you have seen how serious and how negative drugs can be on the population in many ways, and so it is not just the people in Honduras that have been affected, it is also the people in the United States who were the ultimate consumers and buyers of these drugs.

(Sentencing Tr. 20, *United States v. Valladares Garcia*, No. 15 Cr. 174 (LGS) (Sept. 27, 2018)).  Similarly, at the sentencing of Zavala Velasquez, the Court emphasized the abuse of trust connected to this type of conduct by members of the Honduran National Police:

> So this is an extremely serious violation of the law, but also a very serious violation of your duties as a senior law enforcement officer.  You were endowed with the public trust, and you abused that trust, and that means, to me, that you took advantage of a situation and a privilege you had in your society.

(Sentencing Tr. 44, *United States v. Zavala Velasquez*, No. 15 Cr. 174 (LGS) (June 28, 2018)).  Most recently, at the sentencing of Avila Meza, the Court reiterated the harmful impact of cocaine trafficking on Honduras:

> There is no question that the conspiracy was to import cocaine into the United States and to manufacture and distribute cocaine, and that the conspiracy was engaged in violence,

14

and so much so . . . that it has wreaked havoc with the citizens of your country and with the very fabric of the Honduran society and political system and democratic system.

(Sentencing Tr. 56, *United State v. Avila Meza*, No. 15 Cr. 174 (LGS) (March 29, 2021)).

In this case, the Probation Office used similar language to describe the defendant and his conduct: "Zelaya Romero took a sworn oath to uphold the law and protect the public from those who are involved in criminal activity. He willfully participated in a drug conspiracy that flooded the U.S. with metric tons of cocaine." (PSR at p. 20). And the defendant was not just an HNP officer who joined the *Cachiros* and helped the organization move cocaine through Honduras. In addition, he was a manager or leader of the conspiracy, someone responsible for recruiting other HNP officers, such as Cruz Chavez and assassins, Ex. A ¶¶ 10, 20, and well-trusted and experienced enough to be responsible for training other co-conspirators, such as Avila Meza, Ex. A ¶ 8, about how to more efficiently and safely transport cocaine in the defendant's department, Colon. The seriousness of the defendant's drug-trafficking conduct, standing alone, strongly supports the imposition of a within-Guidelines sentence.

But the defendant's drug-trafficking conduct does not stand alone. He was not merely a significant part of an organization that distributed mountains of cocaine and was not only a corrupt police officer who abused his position and connections to help distribute this poison. He was also a murderer. As described above, the defendant admitted to the DEA and has conceded in connection with sentencing that he participated in murders and attempted murders on behalf of the *Cachiros*. (Ex. A ¶¶ 16, 17). The defendant admitted to the DEA that he himself shot and killed someone at Leonel's behest, using a semi-automatic 9 mm firearm, and helped plan and participate in several other murders. (*Id.*). In 2011, he helped lead a stakeout for the victims of a massacre at the airport in San Pedro Sula, resulting six dead after a cold-blooded execution. (*Id.*). In July 2013, the defendant helped organize the botched murder of a reporter—resulting in the death of

an innocent victim.  And in both 2012 and 2013, the defendant assembled teams of hitmen to murder a rival drug trafficker and a lawyer who refused to return a retainer fee that lawyer was paid.  (PSR ¶ 17(b)).  While these murders were ultimately unsuccessful, it was not for the defendant's own lack of effort—he orchestrated the attempted murders, finding hitmen who were ready and willing to carry out the respective executions.

*       *       *

In sum, the defendant's conduct was multi-faceted and, quite literally, deadly.  He had a leadership position with the *Cachiros*.  He was trusted enough in that organization to be responsible for recruiting other members of the HNP to join their conspiracy and was violent enough that he participated in multiple murders for Leonel and the organization.  Accordingly, the nature and seriousness of the defendant's offense conduct counsels strongly in favor of a Guidelines sentence.

### B.      The Defendant's Personal Characteristics

As further discussed below, the defendant's personal circumstances do not merit the extreme leniency he now seeks.  *See* 18 U.S.C. § 3553(a)(1).  The defendant was well-educated and well-paid.  (*See* PSR ¶¶ 60 (noting that the defendant graduated from the police academy); 64 (noting that the defendant earned approximately $45,000 annually)).  Instead of taking advantage of these opportunities to try to better his country, the defendant did just the opposite and abused his position and official duties to help traffic tons of cocaine.  While he had no criminal record in Honduras, a lack of criminal history is only a mitigating circumstance when it results from a lack of crime.  That is not the case here.  Instead, the defendant has no criminal history because he was one of the people who helped perpetrate the rot of fundamental institutions in Honduras, and he was never arrested because he profited from a corrupted system that protected him and his co-conspirators.  In short, while the defendant does point to certain mitigating factors in his personal

characteristics and history as further discussed below, none justifies the relief he now seeks and, instead, certain of them only aggravate the severity of his conduct.

### C.    The Need to Avoid Unwarranted Sentencing Disparities

In light of the seriousness of the offense and the defendant's personal characteristics, the need to avoid unwarranted sentencing disparities also supports the imposition of a Guidelines sentence.  *See* 18 U.S.C. § 3553(a)(6).  "[T]he primary purpose of § 3553(a)(6) is to reduce unwarranted sentence disparities on a nationwide level."  *United States v. Simpson*, 898 F.3d 287, 314 (2d Cir. 2018) (internal quotation marks omitted).  As a starting point, the defendant's stipulation to a level-38 drug quantity under the Guidelines illustrates the uniquely serious nature of his cocaine-distribution conduct, alone, without accounting for the multiple murders he committed.  Indeed, in fiscal year 2019, only 6.6% of 19,421 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[5]  And, Courts applied aggravating role adjustments pursuant to U.S.S.G. § 3B1.1 in only 1,419 drug-trafficking cases in fiscal year 2019.  The magnitude of the defendant's cocaine distribution stands out against the vast majority of such cases.

In addition, although co-defendant sentences are not dispositive with respect to Section 3553(a)(6), there are several co-defendant benchmarks in this case for the Court to consider.  At the outset, the Government considers the defendant to be the most culpable of the HNP defendants. He stipulated to a 3-level enhancement based on his role as a manager of the conspiracy, participated in multiple acts of violence and murder, recruited other members of HNP to join the conspiracy, and participated in the *Cachiros* conspiracy over a number of years.  Further, the

---

[5] These statistics are taken from reports prepared by the United States Sentencing Commission, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Guideline_Based.pdf.

defendant pled guilty to not just his involvement in a cocaine importation conspiracy, but also one that involved the use of firearms.  (*See* PSR ¶ 6).  This, too, makes him more culpable than his co-defendants, and the most culpable HNP member charged in this case.  Thus, while the co-defendant sentences provide a relevant data point, they in no way fully capture the depravity of the defendant's own role and conduct.

Turning to his co-defendants, the Court sentenced Lopez Flores principally to a 60-month term of imprisonment, just below the 74-month term of imprisonment the defendant now seeks. (Def. Supp. at 2).  There, however, the Court found that there was "nothing in the record to show that [Lopez Flores'] involvement either preceded or extended after" the 2014 meetings that were part of the DEA's sting investigation.  (Sentencing Tr. 23, *United States v. Lopez Flores*, No. 15 Cr. 174 (LGS) (Feb. 6, 2018)).  The defendant, on the other hand, joined the *Cachiros* in 2004, and had an extensive role assisting the organization in cocaine distribution and violence.  Second, the Court sentenced Zavala Velasquez principally to 144 months' imprisonment.  Zavala Velasquez, however, also was not a full-fledged member of the *Cachiros*.  Third, the Court sentenced Valladares Garcia principally to 168 months' imprisonment, a within-Guidelines sentence.  Valladares Garcia and the defendant are, perhaps, the most similarly situated among the defendants in this case—they both were long-standing members of the *Cachiros* and both participated in murders and acts of violence.  The defendant, however, has admitted to being a manager or supervisor of the criminal activity, thus attaching a three-point Guidelines enhancement not applicable to Valladares Garcia.  (*See* PSR ¶ 6(a)).  Thus, if anything, the Valladares Garcia sentence supports the imposition of a Guidelines sentence in this case, as well.

Finally, the Court most recently sentenced Avila Meza on March 29, 2021.  The Court recently sentenced Avila Meza to a below-Guidelines sentence of 144 months' imprisonment.  In

sentencing him, the Court found that Avila Meza was "not the police officer with the gun at the checkpoints" and was "not delivering the drugs from one hand to the next[.]" (Sentencing Tr. 56, *United State v. Avila Meza*, No. 15 Cr. 174 (LGS) (March 29, 2021)).  Of course, the defendant did just that – he was a police officer escorting cocaine, and recruiting other members of the HNP to do the same.  Further, in stark contrast to the defendant, the Court found that Avila Meza "didn't engage . . . in acts of violence in the murders that many of [his] coconspirators did[.]" (*Id.* at 57).  Finally, the Court found that the defendant's role was "largely as an attorney[.]" (*Id.*).  Again, the defendant's conduct stands in stark contrast.  Among other things, he was tasked with showing Avila Meza the contours of Colon before their planned operation for the *Cachiros*, and himself recruited another HNP member to join their conspiracy.  (Ex. A ¶¶ 8, 10).  And, despite the mitigating factors the Court found in sentencing Avila Meza—which are not present for the defendant here—the Court still imposed a 144-month sentence of imprisonment.  Again, if anything, that sentence speaks to the need for a Guidelines sentence in this case.

In sum, both national sentencing statistics and other sentences in this case support the imposition of a Guidelines sentence.

### D.    The Need for Deterrence and Just Punishment

The need for general deterrence and just punishment of large-scale drug trafficking by public officials and police officers such as the defendant further supports the imposition of a Guidelines sentence.  *See* 18 U.S.C. § 3553(a)(2).  The Court has emphasized these considerations in the context of this case at related sentencings.  For example, at the sentencing of Lopez Flores, the Court reasoned:

> I do think it's important to impose a substantial sentence of incarceration to set an example so that not only you but so that other law enforcement officers in your country and other countries might be deterred from committing similar crimes.

(Sentencing Tr. 25, *United States v. Lopez Flores*, No. 15 Cr. 174 (LGS) (Feb. 6, 2018)).  In connection with the direct appeal of Fabio Lobo, the Second Circuit endorsed this approach: "[T]he district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking." *United States v. Romero*, 749 F. App'x 31, 35 (2d Cir. 2018).  Here, the defendant was not only a public official who abused his HNP position and access to information to assist the *Cachiros*, but he also recruited other members of the HNP to do the same.  A Guidelines sentence would send the message to the public in Honduras and elsewhere in Central America that this conduct will not be tolerated in the United States, and that rampant corruption has consequences.

In addition, specific deterrence is paramount in this case.  The defendant was involved with the *Cachiros* for years, all while nominally employed as a member of the HNP.  The defendant's only reported employment was with the HNP, PSR ¶ 64, and, as he has since admitted to the DEA and in connection with this case, he was a dirty police officer during almost his entire time with the police force.  There is simply no reason to believe that the defendant will, for the first time in his adult life, become a law abiding citizen after his term of imprisonment is over.  As such, a sentence within the Guidelines range is necessary to deter the defendant from engaging in criminal conduct once his sentence is completed.

## II.    The Defendant's Sentencing Arguments Are Meritless

As the Court is aware, the defendant's sentencing was originally scheduled for August 7, 2018.  The Court adjourned that sentencing, in part due to certain factual disputes and arguments made by the defendant in his original submission, particularly related to acts of violence.  Eventually, the defendant informed the Court that he did not want to have a *Fatico* hearing on

those previously disputed issues.  As detailed below, the defendant's sentencing arguments do not merit the far below Guidelines sentence he now seeks

### A.  The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence

First, the defendant argues that he deserves leniency based on the purported issues he faced as a member of the HNP and the resulting mental health issues that he claims drove him, in part, to join forces with the *Cachiros*.  (Def. Mem. at 8-9).  The defendant, however, did this for more than a decade, and doubtless had many opportunities to leave the conspiracy that he chose not to pursue.  *Cf. United States v. Villegas*, 899 F.2d 1324, 1343-44 (2d Cir. 1990) (noting, in part, that defendant asserting duress defense must show that there was "no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity.").  Further, the defendant does not account for his own role in perpetuating the very system he now blames for his conduct.  The defendant complains of the "dangerous reality of police work in Honduras," while wholly failing to acknowledge that he was a trusted member of the *Cachiros*, one of the largest and most violent drug trafficking organizations in the country.  Similarly, the defendant argues that he was in "continuous fear for his life" and was "emotionally drained" because he had to inform the families of deceased individuals that they had been killed; brazenly, he fails to acknowledge that he himself was the cause of some of these same notifications, given that he participated in multiple murders with the *Cachiros*.  In short, the defendant should not profit from the system he helped perpetuate.

Next, the defendant argues in his initial submission that his post-arrest rehabilitation merits leniency, and the Government recognizes that this is a factor for the Court to consider in arriving at the appropriate sentence.  (Def. Mem. at 14-15).  However, while the defendant's conduct in prison appears to be a welcome break from his cocaine trafficking and murderous ways while he

was in Honduras and not facing sentencing in a federal case in an American courtroom, the defendant's good conduct will be rewarded, if it continues, in the computation of his release date. The Bureau of Prisons is permitted to credit a defendant's sentence up to 54 days for each year of imprisonment imposed by the Court, so long as a defendant "has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b)(1). As such, there is already a mechanism in place to both incentivize the defendant's continued good conduct while in custody and to reward him for any good behavior, and the defendant should not receive the windfall he now seeks for completing educational and work-related programs while in prison.

Finally, the defendant argues that his conditions of pre-trial confinement merit leniency. (Def. Mem. at 16-17). In support, the defendant cites to *United States v. Ozols*, in which Judge Furman gave "some acknowledgment" to a similar argument from a defendant based on conditions of confinement at MDC. (*United States v. Ozols*, 16 Cr. 292(JMF), Dkt. 234 at 31). First, in *Ozols*, Judge Furman ultimately sentenced the defendant to a 39-month term of imprisonment, only 12 months below the bottom of the 51 to 63-month Guidelines range in that case. (*See Ozols*, Dkt. 234 at 9, 32). However, this was not solely due to the conditions of the defendant's confinement; indeed, Judge Furman primarily acknowledged that he was "moved by [the defendant]'s obvious remorse and contrition." (*Id.* at 30). Further, Judge Furman noted that it was the defendant's first offense, and there was not a great need for specific deterrence—a stark break from the defendant here, who had been a violent criminal for years before his arrest in this case and never shown the ability to lead a law-abiding life. (*Id.*). Despite all of this, the ultimate sentence was still only 12 months below the bottom of the applicable Guidelines range. Thus, to the extent *Ozols* supports any leniency here, it supports a very small break from the applicable Guidelines range.

22

In addition, while the defendant points to the conditions of confinement at MDC, it bears noting that he spent more time than he otherwise would have in presentence confinement because of his own requests for adjournments and his frivolous objections to the PSR that he has since abandoned.  Indeed, according to the plaintiffs in the still-pending litigation in the Eastern District of New York, the power outage that the defendant now complains of took place between January 27, 2019, and February 3, 2019.  *See Scott v. Quay*, 19 Civ. 1075 (MKB) (SMG), 2020 WL 8611292, at *1 (E.D.N.Y. Nov. 16, 2020).  In this case, the defendant's sentencing was initially scheduled for August 7, 2018—months before the fire allegedly took place.  There were then a series of adjournments at the defendant's request, including when he requested new counsel and sought more time to gather materials for sentencing, and ultimately due to his since-abandoned factual arguments concerning his involvement in violence.  As such, the length of time the defendant has spent at MCC is largely attributed to his own decisions, and does not justify the relief he now seeks.

### B.   The COVID-19 Pandemic Does Not Support A Non-Guidelines Sentence

In his supplemental submission, the defendant focuses, in part, on the COVID-19 pandemic.  In particular, the defendant claims that he did not receive adequate medical care when, in late November 2020, he contracted the COVID-19 virus while in custody at the Metropolitan Detention Center ("MDC"); and, more generally and also in his initial submission, argues that the measures MDC took to combat the spread of COVID-19 resulted in conditions of confinement that justify a lower sentence.  While COVID-19 is undoubtedly serious, the defendant's arguments concerning the pandemic do not support his sentencing position.

████████████████████████████████████████████████████

████████████████████████████████████████████████████



The measures particular to the defendant's experience—quarantine at the MDC, for example—were undoubtedly challenging, but equally necessary to the BOP's mandate of mitigating the virus's spread and limiting the defendant's exposure to others. As the Court is aware, the BOP generally, and the MDC specifically, are actively managing the risks presented by COVID-19. Starting in January 2020, the BOP implemented an Action Plan for COVID-19.[7] The BOP continues to revise and update that Action Plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization ("WHO"), the Centers for Disease Control and Prevention (the "CDC"), and the Office of Personnel Management. In addition, the BOP created an "agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and

[7] *See* https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response.

external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management, Department of Justice, and the Office of the Vice President." BOP's current Action Plan, which the MDC has implemented, includes numerous measures designed to protect inmates and staff from the coronavirus pandemic.[8] Moreover, the BOP has begun administering vaccines to inmates and staff.[9] These and other steps show that the BOP is meaningfully addressing the risk posed by COVID-19 to inmates, and that it has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

The Government recognizes that the pandemic has in some circumstances made inmates' incarceration "harsher and more punitive than would otherwise have been the case … because the federal prisons … have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks and citation omitted). The defendant, like other inmates, has been subject to lockdowns at MDC in an effort to prevent the spread of COVID-19 within that facility. However, on the current record, the defendant has not demonstrated that his incarceration has been substantially harsher because of COVID-19. *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020) ("[A]s stated by the Court during oral argument on the instant motions, lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary.").

---

[8] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

[9] *See* https://covid.cdc.gov/covid-data-tracker/#vaccinations.

In sum, the defendant has not articulated why current BOP policies and procedures are insufficient to provide him a reasonable level of care, let alone why the spread of COVID-19 in prison facilities should outweigh the gravity of the defendant's offenses.



### III.    The Court Should Impose Forfeiture

The defendant admitted to the forfeiture allegation in the Indictment during his guilty plea (Tr. 16-17).  Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction."  *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)).  "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited."  *United States v. Monsanto*, 491 U.S. 600, 607 (1989).  The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010); *see also United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019) (holding that "the forfeiture statute for drug crimes is not limited to *profits* from those crimes; rather, it extends to "any property constituting, or derived from, any *proceeds* the person obtained, directly or indirectly, as the result of" the crime of conviction."  (quoting 21 U.S.C. § 853(a)(1); citing *Honeycutt v. United States*, 137 S. Ct. 1626, 1632-33 (2017); and emphasis in original)).

In connection with his pre-surrender interview with the DEA, the defendant admitted that he was paid approximately $120,000 by the *Cachiros* for his work as a narcotics trafficker and assassin.  (Ex. A ¶ 21).  As such, the Court should order him to forfeit that amount.

### IV.   The Court Should Order the Defendant to Pay a Fine

The Court should also order the defendant to pay a fine within the stipulated Guidelines range of $20,000 to $5 million.

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."

U.S.S.G. § 5E1.2(a).  "The burden of establishing inability to pay rests on defendant."  *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).  Where a defendant fails to demonstrate an inability to pay a fine, the Court must craft one based in part on consideration of the § 3553(a) factors.  *See* 18 U.S.C. § 3572(a).

The defendant cannot meet his burden of establishing inability to pay a fine.  While the defendant has no assets in the United States, PSR ¶¶ 66-69, the defendant admitted to the Probation Office that he earned an annual salary of approximately $45,000 before his arrest in this case, PSR ¶ 64.  This, of course, is in addition to the ill-gotten gains he received as a paid member of the *Cachiros*.  Therefore, absent a stronger showing by the defendant of an inability to pay, the Court should impose a fine.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to a Guidelines term of imprisonment, require forfeiture in the amount of $120,000, and order the defendant to pay a fine.

Dated: New York, New York
      April 26, 2021

                                        Respectfully Submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York


                              By:  _____/s/_____
                                        Jacob Gutwillig
                                        Jason A. Richman
                                        Elinor L. Tarlow
                                        Assistant United States Attorneys


Cc:    Defense Counsel
       (Via ECF)